Thank you, Your Honor. And may it please the Court, Angela Campbell and Michael Carroll for the appellants and relators, Stephanie Strubbe, Carmen Trader, and Richard Christie. We're here today appealing an order from the District Court dismissing a case which we submit drastically changes the standards for employees to be able to bring claims under the False Claims Act against their employers when they have reasonable belief that fraud is being committed and evidence that fraud is being committed, but they simply have no access to the physical claims that are being submitted for payment. We submit that this District Court's order should be reversed because the circuit and the statute do not anticipate that you have to work in the billing department and have access to those bills in order to support a False Claims Act claim. We further submit that this Court should reverse the District Court so that protected activity under the False Claims Act is not being read to be synonymous with the unsealing of the False Claims Act complaint and that the defendants cannot simply set forth another illegal purpose for firing the relators so as to prevent a fact question going to the jury. Now, I think it's important to start with what the defendants did not argue in their brief. They did not set forth a reasonable or legal way by which paramedics can bill for breathing treatments as separate billable ancillary services under the Medicare benefit. They do not argue that the scheme that the relators set forth is legal. They do not argue that they didn't receive extra payments or that the regulations allow for it. What they have argued in its entirety as it pertains to the underlying False Claims Act substantive complaint is that we don't have the bills so we can't plead fraud. Well, Counsel, in fairness to them, don't they really argue that you didn't allege anything about it? Don't you have to make some allegation about payment? We do. We make allegation about payment and how it's paid in our complaint. What we don't have are the physical bills by patient to demonstrate that each ancillary bill is being paid by Medicare. We have pervasive conduct that shows... Oh, you know, I get that and you keep making reference they don't have the bills. But here's my question, is that they certainly had knowledge of who the patients were that they performed the breathing treatments on, say, for example, and they know generally what dates those occurred and there's no allegations of that either. You know, they haven't gone and said, well, we were asked to provide breathing treatments on these dates to these particular people or on these particular ambulance runs that we performed them and we, on information and belief, believe they were billed, right? Instead, this is a motion on the pleadings and so it just says you didn't plead it such that we can identify it and defend it. Why are they wrong? They're wrong because it's easy to identify it. When it comes to the breathing treatments specifically, and I'll talk about those separately from the mislabeled employees, from the breathing treatments specifically, they plead that as soon as Bill Bruce changes the policy, which is in November of 2014, the paramedics are going in every night and every weekend and performing every breathing treatment in the inpatient hospital and that those are being done so as to increase, and they've admitted it has a payment impact, increase the bills that are being submitted to insurance, including Medicare. So they have pledged it. It starts in November of 2014 and it continues at least until the firing of the relators. Well, counsel, hospitals still do uncompensated care. I don't mean to inject that because I don't know the other side did, but it's in my mind so you should know about it. And, of course, they mess up billing many other ways, hospitals do. So how, from your perspective, how much do you have to plead so we know there's some connection to payment? Because, as you know, this is False Claims Act, False Payment Act, you know what the act's about. So help me on that. Well, first off, there could be no other logical reason. I can think of no other logical reason to take the nurses off of the floor of the hospital, send them to cover the emergency room, send the people from the emergency room to perform the breathing treatments, which they're less qualified to perform if it's not for billing purposes or cost reimbursement purposes. And they're told it's for billing and cost reporting purposes. You're doing this for billing and cost reporting purposes. That's what they're told by their supervisor. And so there is a direct link to their providing of the service and the billing. So tell me where in your complaint you say this about the supervisor. What paragraph? Yeah, what paragraph if you could. Yeah, I can. I'd have to grab the complaint. And you can put a 28-J letter to us, your experience. Go ahead. Yeah. So we do put it in the complaint because what it says is that they are told it's for billing and cost reporting services. It's cited in my brief. The complaint says that Bruce Musgrave is their supervisor and that Bruce Musgrave, first the staff are told that it's for billing purposes, and then Bruce Musgrave specifically tells them it's for cost reimbursement purposes, for cost reporting purposes. At the time the change is made. Is that your best allegation in the complaint? I have many allegations in the complaint. No, I know that. And it's a terrible question for you. I understand. No. But I'm sincere here. Is that what we should really look at to say, yes, they did plead, payment, submission? Well, we also set forth how they plead it or how they submit the bills. We set forth that for all the other costs, it's 101% reimbursement, and that for these costs, they would be ancillary payments, so additional payments outside of that 101%. We also put forth the reasons why we believe it's billed. The paramedics aren't providing pro bono services, as the court is implying. They're being asked and trained to enter their time, which we plead in our complaint, into the software that is used to generate the bills. Not only are they asked to enter their time, they're asked to enter their time in 30-minute increments, no matter how long it took to put in 30-minute increments. It just so happens 30-minute increments is the amount of time needed to be able to bill a separately billable ancillary service for an outpatient. Now, you can never bill them inpatient. They can't bill the paramedic as a separately billable ancillary as an inpatient. But having them just so happens to comply with this fact that you have to have this 30 minutes to be able to bill it to the outpatient standards. You don't see any argument from the defendant that this is proper or that this is legal or that there is an innocent explanation. All they say is we don't have those separately billable ancillary provisions of services to each of these patients. Now, they rely on this idea that we need to identify a patient. I don't think that's accurate. Thayer sets forth that you don't need representative samples of individual patients if you can plead the scheme. But wait, the Joste case says you have to, right? And it's later? And it interprets Thayer? I'm right about that. No, the other way around, aren't they? The other way around. Okay. Thank you. Joshe is before Thayer, and Thayer explains Joshe. And the difference is here, Dr. Joshe wasn't providing services to any of the patients, and he wasn't doing any of the billing. He was saying that over a 16-year period, all of these prescriptions, all of these providers, all of these things were fraudulent. And he had no inside information for it. He wasn't the one providing the services, and he wasn't the one doing the bills. Thayer comes in and says, okay, well, we did say that we ruled it on Joshe. But what Thayer is saying is if you can explain the scheme and then you have reliable indicia of fraud, that's sufficient to survive a motion to dismiss. And that's exactly what we have here. We have exactly what the scheme is. You send the paramedics to the room, you have them provide the treatment, and then they bill it separately. We identified the paramedics providing the services. Two of the paramedics that are relators in this case provided services under that scheme. They complained about the scheme to the nurses. They asked, why are we doing this? Why are the nurses being pulled off of a floor? Why are we removing the RNs and having the paramedics come from the ER to do these breathing treatments? It makes absolutely no sense. And they're told, well, it's for billing and cost-reporting purposes. So we have all of this evidence that shows that that's the whole reason. And what would you then say the second part you described as being indicia of fraud? What specific items would you point to on that? The indicia of fraud is, number one, they fired them after they complained. They threatened to fire them. And then they actually did it. They actually have no logical reason for submitting the, having the paramedics do the breathing treatments. They're less qualified than a registered nurse. We've submitted the rules and regulations which would prevent why a registered nurse wouldn't be doing the breathing treatments, because then the hospital would have to bundle those payments and would get less money if a nurse does the breathing treatment than if they come up with some other sort of ancillary staff to do the breathing treatment. We've provided the regulations and the statutes which show that a paramedic is not a separately billable ancillary staff, that even if this was proper, they aren't specially trained like a respiratory therapist. So they couldn't be billed regardless. We provided evidence that they're told it's for cost-reporting purposes. And then we provided all this other evidence that we've got fraud going on in this hospital. There's the human resources manager tells them, I think the CEO is committing fraud. Their manager says, I think the CEO is perpetuating fraud. We've got these mislabeled employees that are being uncovered by the employees, by their relators. We have Jonathan Richard, who was not a paramedic, who had to have someone, either Bruce Musgrave or Bill Bruce, go in and change his title from EMT to paramedic in the billing software in order to bill him as a paramedic when he wasn't a licensed paramedic. And then immediate threats of firing the employees when they bring it to their attention, and eventual actual firing of the employees. And then we've got these, you know, the district court calls it gossip. But we've got all this information about there's credit card fraud going on. And guess what? There's credit card fraud going on when you actually pull out all the documents. No legitimate reason to be falsifying invoices to provide to the government unless you're trying to cover something up. And I wish you, if you take a look at the actual sheet, which is in this record, I don't believe, but clearly altered and clearly altered invoices. All of these things indicate that there's evidence of fraud. And so we believe that we've survived, we've pled it sufficiently, and we should survive the motion to dismiss. I'll reserve the remaining time. Mr. Hontos. Good morning. May it please the court. Alex Hontos of Dorsey & Whitney on behalf of Crawford County Memorial Hospital, which is a rural hospital about 70 miles from here, and Bill Bruce, its CEO. The False Claims Act is about claims. And the allegations, even charitably read, identify two claims, cost reports to Medicare and actual reimbursement requests to Medicare. What year's cost report is even at issue in this case? I've spent two years with this complaint, I've listened to the argument today, and I still don't know. Well, now wait, go slowly. I appreciate your testimony, but let's go slowly. If you look at the Thayer case, it says a plausible inference that false claims were presented. Why doesn't the supervisor telling them it's for that constitute a plausible inference that it was going to be a claim? I don't think that's sufficient under the standard. I think that the court has to apply its common sense and the purposes of Rule 9B, the who, what, where, when, and how of the fraud. And I just don't think that gets them there. This idea that the supervisor, what role does the supervisor have with respect to billing? What role does the supervisor have with respect to- Submitting the raw data. I can answer that rhetorical question. Sure, but what- The supervisor submits the raw data. It's no better than the raw data. Back to the purpose of the False Claims Act, and this court has been crystal clear. It's not about policing private misconduct. It's not even about policing misconduct that amounts to fraud. The False Claims Act is about the submission of a payment that causes the government to falsely pay money. And that's not something- But do you agree that by the way the Thayer case reads, because apparently we adopt the Fourth Circuit standard, it could have led, but need not necessarily have led, to the submission of false claims. Why is it what they have enough to say it could have led, but did not necessarily lead to? That gets around the problem of, you heard in the previous case of, nobody knows what they really get paid under Medicare. Go ahead. Well, I don't think the Thayer standard is satisfied. I mean, plain and simple. Particular details. What are the particular details of the actual fraud? I don't think they make it on that prong. And on the reliable indicia, there's got to be some- What would they have needed in addition to what they've pled? Some details about the date of the Medicaid cost reimbursement report. That would be useful. What specifically was wrong on the Medicaid cost reimbursement report? Going to the billing, what patients are even at issue in this case? I thought they identified some patients. No. I thought they identified two patients. They did not. Oh. Let's talk about that. I thought she just said they did. Tell me. Well, I heard some things that were just frankly wrong in that presentation. Well, tell me about the two people that are identified. So the only patient that is identified is at Appendix 18, Paragraph 37. And this is the famous Patient A, known to traitor. No patient name is actually associated with that. No date. No further details about what this particular patient received by way of breathing treatments or by treatment by someone who wasn't qualified or was tainted by credit card fraud or anti-kickback or any of these other parade of horribles that you see in the pleading. That is the only example that even comes close to this court's precedence which require either representative examples or particular details coupled with reliable indicia. And I think that is fatal to the case. And Judge Strand, there was a suggestion that Judge Strand misapplied the standard. I think the language was drastically revising the False Claims Act jurisprudence. If you read his opinion, what does he do? He goes through Joshi. He goes through Thayer. He goes through Miller. All of the cases, there's no drastic revision of what 9B means in this circuit or what 8A means or what the False Claims Act's reach is. So you have a very careful analysis by the court using the regular, ordinary standard that was put forward in cases like Joshi. This case is just like Joshi. We disagree the notion that, oh, Joshi is distinguishable. Joshi is right on point. If there's one case the court should read, it's Joshi. There you had a provider who didn't have any visibility into the billing aspects of the hospital at issue, much the same way here. There you had a motion to dismiss filed and the court saying it's not sufficient to simply suggest and sort of intuit that, oh, well, this must have gotten back to the United States government. It must have been paid by the United States government. This court said, no, that's insufficient. So when the district court says this is speculation, conjecture, and gossip, what he's done is he's looked at the case law, the standards that this court has applied. He's applied them faithfully. He's looked at the complaint where he can find absolutely no representative examples. I don't even think that patient A representative example, that's their best argument. I don't think that qualifies. It doesn't even identify the person. Which person are we talking about? On what day? What was provided? Did that person's claim actually get back to Medicare or not? We don't know. We have none of those details. We were criticized in the opening for not putting on some kind of a full defense as to the legality on the question of the Medicaid statutes in particular. How could we? And that's precisely what 9B is all about. Well, you could on this breathing scheme. You could talk about breathing by nurses versus breathing by paramedics. I don't think that's required, number one. But look at the court's precedence on 9B. What is the point of 9B? It's to quickly identify for the defendant who's being accused of fraud on the government, an exceptionally serious accusation, to quickly identify what specifically is wrong here and to respond to it. Now, truth be told, we will respond to it. If this case were to go back, you can be sure we're going to respond to it at summary judgment. But the point is that we can't be criticized, and this gets right back to 9B's essential purpose. Who, what, where, when, how. It matters, and it matters because you have to be able to put defendants like Bill Bruce and Crawford County Memorial Hospital on notice of what's going on here. The other thing I'd like to point out, unmentioned in the opening, is this notion of upon information and belief. Now, there's nothing wrong with upon information and belief pleadings. What do you think the law is in this circuit upon information and belief pleadings? What do you think this circuit is on that? Another reason why Joshi is so important, also look at the Parnes case. Those are the two cases that say when you're going to do that, and it's fine to do that. But when you're going to do that, you have to state the source of the information. I'm quoting from Parnes. The source of the information and the reasons for the belief. The source of the information and the reasons for the belief. Now, if a False Claims Act claim turns on the submission of a claim to the government, that Medicare cost report or that individual patient bill that was somehow fraudulent, where is that information in this case? It's not there. I commend the complaint to you. Look at the complaint and see if you can find either the source of the information and the reasons for the belief. You will not find those as to the Medicare cost reports and the reimbursement claims. You just won't. Now, that's a separate fatal defect. If they're going to use upon information and belief type pleading, then this court has been very clear that those are the two things you have to do, and they didn't do that here. We also, in our brief, mentioned issues of materiality, and Santa, I'd like to very briefly touch on those. They would provide an independent basis for affirming Judge Strand's decision. Of course, failure on one element. Failure to plead one element of a False Claims Act claim. Whichever of the elements would be sufficient to affirm. On the question of materiality, there's simply no plausible facts that CMS even relied or cared about the billing. They have to say something about materiality. There was a Supreme Court case from a couple of years ago called Escobar. It has been interpreted by this court recently in the Miller case, I believe. Judge Benton, I think you wrote that decision. In Escobar, the Supreme Court says materiality matters. It is a rigorous standard. It is a demanding standard. You have to show that the fraud actually would have affected payment. Is there anything in here about, well, in the mine run of cases, that's the Supreme Court's language as an example. It's one of the ways one can show materiality. Is there anything in the complaint that in the mine run of cases, CMS doesn't pay bills that contain the fraud that relators allege occurred? Nothing. There's nothing in the complaint about materiality. Zero. That's in the statute, and it's emphasized by the court's decision in Miller as interpreting Escobar. I would like to talk just for a minute, I see my time is getting short, about the retaliation claim. Again, being accused of a drastic revision of the court's precedence. Not so. Shewhart and Miller, they set forth a standard for how to plead and how to prove a FCA retaliation claim in this circuit. We fully embraced those standards. The district court here said that these claims fail, and I'd like to talk particularly about Strube, although this analysis applies to essentially everyone. The fact of the matter is that these relators cannot show that their adverse action was caused solely by their FCA activity, and that is fatal to their claim of retaliation. This court has been crystal clear that it is a single-purpose test. It is not a dual-purpose test, as was argued in the brief. I think there was a cite to a district court case. That's not the law in this circuit. This is an issue that's been covered, that the FCA's retaliation claim is about policing retaliation not just generally. It's not some FLSA-type common law retaliation claim. It's about specific types of retaliation, and it's limited to retaliation when it comes to a False Claims Act claim. Relators here have alleged that there's all sorts of other stuff going on. Alleged that there's other stuff going on. Appendix page 37, Relator Christy alleged that in May 2015, it was alleged that he had called a patient fat, and that was a basis for his dismissal. In July 2015, Trader had permitted an unauthorized nurse to care for a patient. That's Appendix 40, Paragraph 183. That's directly from the complaint. So by their own pleading, they have shown that they can't satisfy this court's test, the sole-purpose test. They provided additional reasons why the hospital's decision was not retaliatory, at least not under the False Claims Act's retaliation provision. 3730, Section H. Now, as to Strube, you see a similar pattern. Strube, of course, got through the motion to dismiss, at least as to the retaliation claim, and got to summary judgment. And there, there was undisputed evidence that Strube had been removed from her status pursuant to the hospital's policy. She hadn't worked for six months. And the hospital has a policy in effect since 2013 that if you don't work for six months, if you're unable to work, and in this case she was unable to work because of medical issues, if you're unable to work, then we have to have an end at some point. And the hospital reasonably applied its policy, and under this court's sole-purpose test, that cannot be, as a matter of law, retaliation under the False Claims Act. Unless there are further questions, we'd ask that the court affirm the decision of Judge Strand. Thank you. Ms. Campbell, were you brought up? Thank you, Your Honor. I did look quickly. Paragraph 27 is where we pled that the paramedics were informed in writing that the change for breathing treatments was for billing purposes, and then told by Bruce Musgrave, their supervisor, it was for cost reimbursement purposes. Thank you. We did identify the one patient, patient A. It's a little bit of a red herring. We identified it as to demonstrate why we believe that they were falsely increasing the number of patients that were getting services. There is no need to identify every patient, or representative patients that received breathing treatments on nights and weekends from November 2014 to the firing of the paramedics. We did identify two employees who were mislabeled, Zach Rasmussen and Jonathan Richard, by name in the complaint. I want to touch briefly on this idea that we can't show retaliation. Essentially what CCMH is arguing is, as long as they come up with a reason, even if it's illegal, they win a summary judgment. We submit that that's just not the case. It's a fact question. This isn't a question of whether or not the jury came to the wrong decision, or a fact finder came to the wrong decision. It's whether or not we've established a fact question, a genuine issue of material fact, as to whether or not these people were fired for engaging in protected activity. Otherwise, all they could do is just fire them as soon as they start investigating, because they won't have filed their false claims at complaint yet. Or they could just cut their hours and then fire them for not having enough hours, as they did to Ms. Struby. Or they could just wait for a few months after the complaint is unsealed and then make up a reason that they fired them. These are fact questions. It deserved to go to a jury, whether or not it was a reason that they were fired was because of their investigation or because of some other reason. You agree it's a solely motivated standard, though, correct? I would agree the circuit says it's a solely motivated standard. I do think that there's a difference between a solely motivated standard and two illegal standards. You can't be like, oh, you were investigating fraud, you're black, you're fired, and that's my reason. You can't do that. You can't come up with another illegal reason and then fire them for it when the underlying reason was that and then say, look, I had two reasons. That's what they're doing to Jonathan Christie. I have two reasons. One, they try to bring up this idea that he was gay and that there were drastically derogatory statements made towards him during this time about his sexual preference. You can't do that and then say, look, we fired him because he was gay, not because he was investigating fraud. That wouldn't be proper. In addition, Your Honors, the dismissal and the summary judgment both were relying upon this idea that there's a policy violation, that someone violated a policy, like Strube violated a policy, and they're citing Twyman. But Twyman was about pornography on a computer, not about whether or not the employer gave her enough hours. If there's no further questions, thank you. Thank you for the argument, counsel. Case 18-1022 is submitted for decision by the court.